UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS M. SMITH, <br><br> Plaintiff, <br><br> v. <br><br> GOLDEN STATE WARRIORS, LLC, <br><br> Defendant. | Case No. 18-cv-06794-SI <br><br> **ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 48, 49, 50, 52, 55 |

On April 17, 2020, plaintiff Nicholas Smith and defendant Golden State Warriors, LLC ("the Warriors") filed cross motions for summary judgment. Dkt. Nos 48 and 49. Mr. Smith's complaint generally alleges violations of various California Labor Codes as well as various discrimination and retaliation claims. Pursuant to local rule 7-1(b) and General Order 72, the May 22, 2020 hearing has been VACATED. Having considered the parties' papers and evidence submitted the Court hereby GRANTS in part and DENIES in part each motion.

**BACKGROUND[1]**

Plaintiff Nicholas Smith worked for the Warriors from July 2012 to March 16, 2018 as a Senior Account Executive in Group Sales. Dkt. No. 52-3 at 7[2]. His complaint alleges 15 causes of action, namely:

---

[1] The following facts are undisputed unless otherwise stated.

[2] For ease of reference, citations to page numbers refer to the ECF branded page number in the upper right corner of the page.

1  (1) Disability Discrimination under the ADA;

2  (2) Disability Discrimination under FEHA;

3  (3) Retaliation (California);

4  (4) Failure to Prevent Discrimination and Retaliation (California);

5  (5) Wrongful Discharge in Violation of Public Policy (California);

6  (6) Violation of California Labor Code § 226(a) – Failure to Furnish Accurate Itemized

7  Wage Statements (PAGA);

8  (7) Violation of California Labor Code § 204 – Failure to Timely Pay Wages;

9  (8) Violation of California Labor Code §§ 201, 202, and 203 – Failure to Timely Pay

10  Wages Upon Resignation or Discharge (PAGA)

11  (9) Violation of Business and Professions Code Section 17200

12  (10) Violation of California Labor Code §§ 221 and 223 – Unlawful Deductions (PAGA)

13  (11) Breach of Contract

14  (12) Violation of California Labor Code § 98.6 – Discrimination/Retaliation for Protected

15  Conduct

16  (13) Violation of California Labor Code § 6410 – Retaliation (PAGA)

17  (14) Retaliation (California Government Code)

18  (15) Whistleblower Retaliation - California (PAGA)

Plaintiff moves for partial summary judgment with respect to claims 6-11 – the wage and PAGA claims. Defendant moves for summary judgment on all claims.

There are two overarching sets of facts: (1) facts regarding Mr. Smith's various claims for California Labor Code violations and (2) various retaliation and discrimination claims.

## I. Facts re Claims 6-11 for Violations of Various California Labor Codes

Pursuant to his yearly contracts with the Warriors, Mr. Smith was paid either a base salary of approximately $36,000 or an hourly rate, but the bulk of Mr. Smith's earnings came from commissions. Dkt. No. 48-1 at 36 – 44 (Commission Plans). The terms of Mr. Smith's commission payments are found in his yearly Individual Sales Compensation Plans and elaborated

2

1   upon more fully in the yearly Sales Compensation Agreements. *Id.* The Sales Compensation

2   Agreements define "Variable Compensation" as "either Commissions or Bonuses or both." Dkt.

3   No. 48-1 at 42 (2015-2016 Sales Compensation Agreement). Pursuant to the agreements,

> [i]n order to be eligible to receive Variable Compensation under this Plan, a Participant must be a Plan Participant when the Variable Compensation is 'Earned.' Variable Compensation is Earned when the applicable ***net revenue***, contract value, and/or booking amount is paid to the Company by the consumer."

Dkt. No. 48-1 at 42 (emphasis added). Periodically, throughout plaintiff's employment with the Warriors, he submitted a spreadsheet reflecting the amount of commission he was owed. Dkt. No. 48-1 at 28-30 (Smith Depo Testimony). On this spreadsheet under the "TOTAL SALE" column was a cell reading "(minus 5% arena fee)." Dkt. No. 48-1 at 60 (Nicholas Smith Commission Spreadsheet); see also Dkt. No. 48-1 at 30 (Nicholas Smith Depo Testimony). Pursuant to the Warriors' contract with the Oakland Coliseum and the Oakland Alameda Coliseum Authority, the Warriors owed a "facility fee imposed by the coliseum Entities on tickets sold to Home Games, which facility fee shall not exceed five percent (5%) of the ticket price." Dkt. No. 48-1 at 69 (Warriors Contract with Oakland Coliseum). Mr. Smith testified that when he first began working for the Warriors, he asked about the 5% arena fee being deducted from his commission:

> A. Well, one of my questions was -- now that I'm recalling and remembering, is about the 5 percent arena fee. That was never deducted -- or that was never put in our commission. So that was one of the questions that was arised (sic) in discussing commissions.
> Q. And when did you ask that question?
> A. From the very beginning, 2012 season.

Dkt. No. 48-1 at 13 (Nicholas Smith Depo Testimony). Current employees of the Warriors testified they understood the 5% area fee was, and is, deducted from gross sales prior to calculating commissions. Dkt. No. 55-6 at 90 (Thompson[3] Depo Testimony); Dkt. No. 48-1 at 81[4]

---

[3] Ross Thompson is the Warriors' Corporate Controller.

[4] Maria Valdehueza, the current Senior Direct, Group Sales for the Warriors, and Mr. Smith's former manager, (see Dkt. No. 48-2 paragraph 1) testified as follows:
Q. And what is the arena fee?
A. It was five percent arena fee that was to be paid back to the arena. That was in connection with our – our commitment to the arena.
Q. And what is your understanding of the commitment to the arena?
A. That the five percent was due back to the arena because we didn't – we were tenants in the building. And so that was their part of the – the revenue of ticketing that they received.

(Valdehueza Depo Testimony).

Mr. Smith was terminated on March 16, 2018. Dkt. No. 48-1 at 34[5] (Nicholas Smith Depo Testimony); Dkt. No. 48-1 at 196[6] (David Kelly Depo Testimony); Dkt. No. 48-1 at 185 (March 16, 2018 email chain between Nick Smith and David Kelly (Warriors' GC) where David Kelly writes "Nick, to clarify, you have been terminated for poor performance."). His final pay stub is dated March 23, 2018. Dkt. No. 50-6 at 127 (pay stub dated March 23, 2018).

## II.   Facts re Claims 1-5 and 12-15 for Discrimination/Retaliation Claims

Mr. Smith began working for the Warriors in July 2012 as a Senior Account Executive in Group Sales and his employment was terminated on March 16, 2018. Dkt. No. 52-3 at 7 (Plaintiff's MSJ. When he started with the Warriors, his manager was Chris Murphy. Dkt. No. 48-1 at 45 (2012 Performance Assessment listing Chris Murphy as manager). At some point this changed, and Maria Valdehueza became Mr. Smith's manager. Dkt. No. 48-1 at 130 (2016 Performance Assessment listing Maria Valdehueza as manager).

In 2014 Mr. Smith was first in group seats sold and number two in overall revenue. Dkt. No. 48-1 at 45. Mr. Smith's manager made positive comments on his 2014 employee performance assessment, stating in part: "Nick had a great year as it pertains to sales results. He led the staff in tickets sold and group deposits and improved his revenue numbers as well. He consistently tries to implement new ideas ands searches for new groups…." *Id*. Mr. Smith's

---

Q. And when did you first become aware of the five percent arena fee?
A. When I started in 2009.
Q. And how did you become aware of the two – the five percent arena fee?
A. In our compensation agreements.

[5] Q. And how did that meeting end?
  A. It ended in John Beaven ask – telling me that I needed to go back and collect my stuff and leave, and did I want to say goodbye to anybody, and that David Kelly would be emailing me something, and that they would get all my checks, you know, my money that they had owed me.
   Q. Anything else you recall about that meeting?
   A. Just being terminated.

[6] Q. Well, do you believe Nick Smith was terminated?
   A. Ultimately, yes.
   Q. And who ultimately decided to terminate him?
   A. Gracie and myself.

manager also noted that "[i]nternally, he has improved of late in his efforts to communicate effectively with his superiors…has taken positive steps recently to improve his conflict resolution approach … has improved in [his teamwork] and has shown signs for great success moving forward." *Id*. at 46-48

In 2015, Mr. Smith continued leading his department in sales and his performance assessment was overwhelmingly positive. Dkt. No. 48-1 at 49-53. Mr. Smith's manager praised Mr. Smith's performance and gave him overall ratings of either "Meets Expectations" or "Exceeds Expectations" in all categories. *Id*.

In 2016, Mr. Smith's manager commented on his performance assessment that "Nick's understanding of the Group Sales business has led to his overwhelming success in this department." Dkt. No. 48-1 at 131 (2016 Performance Assessment). His manager also noted that "[t]he area we'd like to see Nick continue to grow in his ability to communicate internally with colleagues and management." *Id* at 132. With respect to teamwork, his manager commented "Nick has a big interest in the success of the team. He is willing to help train and develop his colleagues and helps with game day … we'd like to see him place the success of the team first. Often times (sic) his passion for his success supersedes his ability to calmly and efficiently work with colleagues." *Id* at 133. Mr. Smith's manager gave him overall ratings of either "Meets Expectations" or "Exceeds Expectations" in all categories. *Id*. at 130-135.

On November 10, 2017, Mr. Smith was given an Employee Warning Notice. Dkt. No. 48-1 at 215 (copy of Employee Warning Notice). The Warriors' paperwork reflects that Mr. Smith was given a written warning for "Violation of Company Policies/Code of Conduct." *Id*. The paperwork describes the infraction as follows:

> Both your supervisor, Maria Valdehueza, and the overall head of your division, John Beaven, VP Ticket Sales, have addressed concerns with you as it relates to your communication style and treatment of your colleagues and supervisors. Despite the conversations, we have not seen an improvement in your behavior.
>
> Specifically, you got into a public disagreement on Wednesday, November 8, ,with another colleague regarding your game schedule and responsibilities on Salvation Army Night for that night's game. You spoke in a tone and manner that was unacceptable and disruptive. The interaction occurred in the group sales area and was witnessed by at least two individuals outside of the department, both of whom commented that your reaction and responses were inappropriate.

5

> This was followed by another incident on Friday, November 10, during a department meeting in which you vigorously objected to observations made by Maria about areas of your improvement for the group. Maria asked to speak with you after the meeting. At that time, your tone became more combative to the point where Maria felt the need to state that she would no longer engage in dialogue if you were going to continue to be disrespectful, and suggested brining in Human Resources into the conversation.

Dkt. No. 48-1 at 215. The warning notice also stated that "[f]ailure to quickly, successfully and consistently address the objectives above may lead to further disciplinary action, up to and including termination of your employment with the Golden State Warriors." Dkt. No. 48-1 at 216.

In late November 2017, Mr. Smith went on disability leave. Dkt. No. 48-1 at 139-140 (November 2017 email chain re Mr. Smith's disability leave). Mr. Smith returned from disability leave in late February 2018. Dkt. No. 48-1 at 142 -143 (February 2018 email chain re Mr. Smith returning from disability leave). When Mr. Smith returned from disability leave, he requested, with the support of a doctor's note, various accommodations including: (1) Mr. Smith could not lift more than 20 pounds from 3/12/18 – 4/23/18 and (2) Mr. Smith needed to attend various physical therapy appointments. Dkt. No. 48-1 at 148 (email chain subject line: "Nick Smith – Work Accommodations & Physical Therapy Schedule").

On March 14, 2018, Mr. Smith met with the Warriors' Vice President of Ticket Sales and Services, John Beaven. Dkt. No. 48-1 at 188. Mr. Beaven testified that Mr. Smith was very emotional during the meeting which lasted approximately 90 minutes. Dkt. No. 48-1 at 207 and 213[7] (John Beaven Depo Testimony). During this meeting, Mr. Smith voiced a number of concerns regarding the Warriors leadership and business model, including:

- describing his previous manager, Chris Murphy, as "sarcastic and demeaning," as well as "combative and belittling."

- even though Mr. Smith was the top group salesperson in the league, the sales goals and

---

[7] Q. So what else do you recall about the meeting with Nick on March 14th?
 A. I think it went as long as it did in part because he was very emotional and at times very angry. There were times when I felt like we just needed to take a pause because even I felt threatened at times.
 Q. Did Nick say he was angry?
 A. He said that this had been draining on him. And I believe he did say he was angry, yes.
 Q. And what, if anything, did he say that made you feel threatened?
 A. His voice raised to a point of almost shouting on a couple of occasions. And I just asked that we take a step back and settle, so that we could have a discussion.

6

1       expectations are unrealistic, and he was often required to work 60+ hours a week
2   -   he was not compensated for overtime and when he raised this issue with his
3       supervisors he was told to "work more efficient during regular hours."
4   -   various workplace factors contributed to his physical and mental injuries

*Id*. Mr. Smith also let Mr. Beaven read a letter Mr. Smith planned to send to Adam Silver, the NBA commissioner. *Id* at 208. The letter to Adam Silver detailed (1) bullying/harassment, sexism, and racism on the part of Mr. Smith's former manager Chris Murphy (2) an incident during which Mr. Murphy allegedly grabbed Mr. Smith's arm in public at a Warriors game and berated him in front of fans, (3) allegations regarding the Warriors failing to pay overtime and "unbearable" comments trying to get sales reps to work even harder; (4) Mr. Smith's belief that he had "become physically, emotionally and mentally injured through this job," including two hernia surgeries, testicle surgery and slipped discs and pinched nerves in his back. Dkt. No. 48-1 at 57-59 (Mr. Smith's letter to NBA Commissioner Adam Silver). In an email to Gracie Mercado and David Kelly summarizing this meeting, Mr. Beaven wrote:

> I told him that there was a lot there for me to digest, but that I could not sit on this – I made it clear that the status-quo is untenable, and that all of this would need to be addressed … He repeatedly told me that he was not threatening – he simply wants the Warriors to be an organization that people want to work for and be a part of. He is convinced we have serious issues. He has not yet decided if he wants to send his letter. When I asked for a copy, he refused to provide me with one.

Dkt. No 48-1 at 188 (email from John Beaven to Gracie Mercado and David Kelly).

Shortly after Mr. Smith's March 14, 2018 meeting with Mr. Beaven, his supervisor, Maria Valdehueza, approached Gracie Mercado in her capacity as VP of Human Resources and described the situation with Mr. Smith as "terrifying." Dkt. No. 48-1 at 128 (Maria Valdehueza Depo Testimony). Ms. Mercado then met with David Kelly and relayed her personal concern that she could not guarantee Ms. Valdehueza's safety while plaintiff remained employed. Dkt. No. 48-1 at 167-169 (Gracie Mercado Depo Testimony).

On March 16, 2018, plaintiff met with Mr. Beaven and Ms. Mercado. Ms. Mercado

7

testified she was concerned for her safety[8] and that is why Mr. Beaven was asked to join this meeting, and she also requested office security be nearby during the meeting. Dkt. No. 48-1 at 171 (Gracie Mercado Depo Testimony). Mr. Smith testified that during this meeting Mr. Beaven told him "we understand you're not 100 percent. You've got a lot of stuff going on." Dkt. No. 48-1 at 34 (Nicholas Smith Depo Testimony). The meeting ended with John Beaven telling Mr. Smith to collect his things. *Id.*

On March 16, 2018, after the meeting, Ms. Mercado emailed Mr. Smith attaching a separation agreement. Dkt. No. 48-1 at 187. Mr. Smith responded explaining he had not resigned and did not want to be punished for raising challenging issues. *Id.* David Kelly emailed a response[9] shortly thereafter stating:

> I was not in this morning's meeting, however it appears there was a misunderstanding. To clarify, your severance is contingent upon a release of any and all claims against GSW.
>
> You were given the opportunity to voluntarily resign your position in lieu of termination. Please understand that, per the agreement you received, you have 21 days during which to consider and negotiate the terms of the severance agreement. However, unless we receive confirmation from you today that you are resigning effective today, your employment with GSW will be terminated effective today.

*Id.* Mr. Kelly sent a follow up email clarifying Mr. Smith was "terminated for poor performance. *Id.* at 186.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only

---

[8] Mr. Smith had previously been inappropriate with Ms. Mercado, in one instance snapping at her to "just shut up and listen" during a one on one meeting. Dkt. No. 48-1 at 162.

[9] David Kelly sent the response instead of Gracie Mercado because Ms. Mercado "implored [David Kelly] as a friend, as a human being, [as she] walk[ed] through LAX voice wavering … please do not make me continue to interact with Nick Smith." Dkt. No. 48-1 at 177.

8

1   demonstrate an absence of evidence to support the non-moving party's case. *Id*. at 325.

2   Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting then Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

For summary judgment, the Court must view evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Id*. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . ." *Id*.  However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). Parties must present admissible evidence.  Fed. R. Civ. P. 56(c).   The right of an employee to a commission is governed by the terms of the compensation agreement.  *Steinhebel v. Los Angeles Times Commc'ns*, 126 Cal. App. 4th 696, 705, 24 Cal. Rptr. 3d 351 (2005).

**DISCUSSION**

**I.   10th and 11th Causes of Action for Violations of §§ 221 and 223 and Breach of Contract, Respectively**

California Labor Code § 221 provides that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Cal. Lab. Code § 221.  "Wages" are defined broadly to include "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the

9

1    standard of time, task, piece, commission basis, or other method of calculation." Cal. Lab. Code
2    § 200. "Section 221 was enacted in order to prevent employers from utilizing secret deductions or
3    kickbacks to pay employees less than their stated wages." *Finnegan v. Schrader*, 91 Cal. App. 4th
4    572, 584 (2001). California Labor Code §§ 221 and 223 are "declarative of a strong public policy
5    against fraud and deceit in the employment relationship. Even where fraud is not involved, [the
6    legislature] disapproved of unanticipated or unpredictable deductions because they impose a
7    special hardship on employees." *Hudgins v. Neiman Marcus Grp., Inc.*, (1995) 34 Cal. App. 4th
8    1109, 1118-1119.

9    "Deductions from such commissions are permitted, however, when (1) the deductions are
10   tied to the employee's sales rather than general business expenses, and (2) the employee agrees to
11   the deductions by contract." *Marr v. Bank of Am., NA*, 506 F. App'x 661, 661 (9th Cir. 2013)
12   (citations omitted) *(affirming Marr v. Bank of Am.*, No. 09-cv-05978 WHA, 2011 U.S. Dist.
13   LEXIS 24868, 2011 WL 845914 (N.D. Cal. Mar. 8, 2011) (granting summary judgment on section
14   221 claim where deductions taken in calculating commissions were tied to plaintiff's specific
15   sales, and plaintiff contractually agreed that the deductions would be taken in calculating his
16   commissions).

17   In *Prachasaisoradej v. Ralphs Grocery Co*., the California Supreme Court analyzed the
18   legality of an incentive compensation plan at Ralph's supermarket chain "whereby certain
19   employees of each store were eligible to receive, over and above their regular wages,
20   supplementary sums based upon how the store's actual Plan-defined profits, if any, for specified
21   periods compared with preset profitability targets." 42 Cal. 4th 217, 222 (2007). To determine
22   whether the profitability target was met, Ralphs subtracted store operating expenses from store
23   revenues. *Id*. Plaintiffs argued this arrangement illegally shifted general business expenses to
24   employees in violation of California Labor Code § 221. *Id*. The court disagreed, explaining the
25   plan was "collective in nature" and not measured according to the individual efforts of any
26   employee but instead by the profitability of the store as a whole. *Id*. Therefore, "[b]y the Plan's
27   terms, it was only after the store had completed the relevant period of operation, and that the
28   resulting profit or loss figure was then derived, that it was possible to determine, by a further

1  comparison to the present targets, whether Plan participants were entitled to a supplementary
2  incentive compensation payment, and if so, how much." *Id*. at 229. The Court further held that
3  "[t]his final figure, and this figure only, once calculated, was the amount offered or promised as
4  compensation for labor performed by eligible employees, and it thus represented their
5  supplemental 'wages' or 'earnings.'" *Id*.

6  The analysis in *Hudgins v. Neiman Marcus Grp., Inc*., is also particularly helpful. (1995)
7  34 Cal. App. 4th 1109, 1118-1119. There the plaintiff, a sales associate, made commissions based
8  on the amount of merchandise she sold. *Id*. at 1113. Her commission could properly be reduced
9  if, at a later date, the merchandise she made commission on was returned. *Id*. at 1112-1113. What
10 the court found ran afoul of §221 was defendant's practice of reducing its salespeople's
11 commissions for unidentified returns – returns that were not attributable to a specific sales
12 associate. *Id*. at 1117-1124. This, the court found, improperly shifted costs from the employer to
13 the employee. *Id*.

14 Here, the parties contracted that commissions would be paid based on a salesperson's net
15 revenue of tickets sold, as stated in the Commission Agreements:

> [i]n order to be eligible to receive Variable Compensation under this Plan, a Participant must be a Plan Participant when the Variable Compensation is 'Earned.' Variable Compensation is Earned when the applicable ***net revenue***, contract value, and/or booking amount is paid to the Company by the consumer."

Dkt. No. 48-1 at 42 (emphasis added). The 5% arena fee must be deducted in order to calculate the net revenue from ticket sales. The deduction is hardly deceitful or otherwise opaque – the spreadsheets ticket sales employees use to submit their commission payment clearly state the "TOTAL SALES" amount is "(minus 5% arena fee)." Dkt. No. 48-1 at 60 (Nicholas Smith Commission Spreadsheet); see also Dkt. No. 48-1 at 30[10] (Nicholas Smith Depo Testimony). Mr.

---

[10] Q. Okay. And with regard to the 5 % arena fee, that was on the spreadsheet at all times, correct?
A. Yes
Q. Did you know that the 5 % area fee was collected by the Warriors and paid to the arena?
A. That was my understanding.
Q. And you knew, at the time that you were employed at the Warriors that you were not paid commissions on that arena fee, correct?
A. Yes

Smith tries to argue the 5% arena fee deduction was not contracted for, but this is inconsistent with his own testimony, that of other employees, and the contracts themselves. Dkt. No. 55-6 at 90 (Ross Thompson Depo Testimony); Dkt. No. 48-1 at 81 (Maria Valdehueza Depo Testimony); Dkt. No. 48-1 at 13 (Nicholas Smith Depo Testimony). Further, the deduction is directly tied to the salesperson – as the arena fee is calculated as 5% of each ticket sold. Dkt. No. 48-1 at 69 (Warriors Contract with Oakland Coliseum). Just as the permissible commission deduction was traceable to the sales associate in *Hudgins v. Neiman Marcus Grp., Inc*, so too is it traceable in the instant action.

Because the evidence shows the commission deduction was contracted for, directly tied to each salesperson's sales, and not hidden or otherwise furtively calculated, the arena fee deduction does not violate §221. As such, plaintiff cannot establish defendant violated § 223[11], nor does plaintiff have a viable breach of contract claim.

As such, the Court GRANTS defendant's motion for summary judgment with respect to the 10th and 11th causes of action for violations of §§ 221/223 and breach of contract respectively.

## II.      6th Cause of Action for Violation of § 226

§ 226(a) requires that an "employer, semimonthly or at the time of each payment of wages, shall furnish to his or her employee … an accurate itemized statement in writing showing (1) gross wages earned … [and] (8) the name and address of the legal entity that is the employer …" Cal. Lab. Code § 226. Plaintiff argues because the Warriors improperly deducted the 5% arena fee, all of plaintiff's wage statements failed to comply with § 226(a)(1) because he was underpaid. Based on finding in Section I above, that the deduction of the arena fee was proper, defendant did not

---

Q. And that practice did not change from 2013 until you were let go, correct?
A. I don't know if it ever changed.
Q. To your knowledge, it never changed between 2012 to 2018, correct?
A. Yes.

[11] Cal. Lab. Code § 223: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."

1  violate § 226(a)(1).

2        Plaintiff argues the Warriors violated § 226a(8) because plaintiff's pay stubs listed the "Golden State Warriors" instead of the "Golden State Warriors LLC" on his pay stubs. Dkt. No. 56 at 8 (Defendant's MSJ). Plaintiff is wrong. Caselaw overwhelmingly shows such a minor difference does not constitute a violation; indeed district courts have generally held that a recognizable variant of the employer's name satisfies § 226(a)(8).[12] *See, e.g., Elliot v. Spherion Pac. Work, LLC*, 572 F. Supp. 2d 1169, 1179-80 (C.D. Cal. 2008), affirmed, 368 F. App'x 761 (9th Cir. 2010) ("Spherion Pacific Work, LLC" sufficient to identify employer with the legal name "Spherion Pacific Workforce, LLC" under § 226(a)(8)); *Mejia v. Farmland Mut. Ins. Co.*, No. 2:17-CV-00570-TLN-KJN, 2018 U.S. Dist. LEXIS 106856, 2018 WL 3198006, at *6 (E.D. Cal. June 26, 2018) ("Farmland Mutual Insurance Co." sufficient to identify employer with legal name "Farmland Mutual Insurance Company"); *Allchin v. Volume Servs.*, No. 3:16-cv-00488-H-KSC, 2017 U.S. Dist. LEXIS 123669, 2017 WL 3337141, at *9 (S.D. Cal. Aug. 4, 2017) (use of employer's doing-business-as name rather than its distinct official name was not in violation of § 226(a)(8)); *York v. Starbucks Corp.*, No. CV 08-07919 GAF (PJWx), 2009 U.S. Dist. LEXIS 131489, 2009 WL 8617536, at *8 (C.D. Cal. Dec. 3, 2009) (use of the name "Starbucks Coffee Company," rather than the official corporate name, did not alone violate § 226(a)(8)).

      The Court therefore GRANTS defendant's motion for summary judgment on the 6th cause of action.

**III.    7th and 9th Causes of Action for Violation of § 204 and § 17200 Respectively**

      Plaintiff's 7th and 9th causes of action cannot survive based on the Court's finding above that the arena fee was properly contracted for. *See Section I above*. Specifically, the 7th cause of action seeks damages for violations of California Labor Code § 204, for the failure to timely pay all wages due. Plaintiff's theory is that because deduction of the arena fee is improper, plaintiff

---

[12] Plaintiff cites *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949, 961 (2005) which is inapposite. There, the defendant's name did not appear anywhere on the actual wage statements.

13

1    was not paid all wages due to him within the time proscribed by § 204 for the entirety of his time

2    with the Warriors. Dkt. No. 52-3 at 14 (Plaintiff's MSJ). Because the Court finds the area fee was

3    properly deducted, plaintiff was accurately and timely paid his wages prior to his termination.

4    Likewise, plaintiff's § 17200 claim is dependent upon the survival of the § 221 claim. Therefore,

5    the Court GRANTS defendant's motion for summary judgment on the 7th and 9th causes of action.

### IV.    8th Cause of Action for Violation of §§ 201, 202, and 203

Plaintiff's eighth cause of action alleges the Warriors violated sections 201[13] and 202[14] of the California Labor Code. If an employer fails to comply with §§ 201 or 202, §203 states the "the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

The evidence establishes plaintiff was terminated on March 16, 2018. Dkt. No. 48-1 at 34[15] (Nicholas Smith Depo Testimony); Dkt. No. 48-1 at 196[16] (David Kelly Depo Testimony); Dkt. No. 48-1 at 185 (March 16, 2018 email chain between Nick Smith and David Kelly (Warriors' GC) where David Kelly writes "Nick, to clarify, you have been terminated for poor performance."). Further, plaintiff did not receive his final check from the Warriors until March

---

[13] 201(a) If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately.

[14] 202. (a) If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting.

[15] Q. And how did that meeting end?
A. It ended in John Beaven ask – telling me that I needed to go back and collect my stuff and leave, and did I want to say goodbye to anybody, and that David Kelly would be emailing me something, and that they would get all my checks, you know, my money that they had owed me.
Q. Anything else you recall about that meeting?
A. Just being terminated.

[16] Q. Well, do you believe Nick Smith was terminated?
A. Ultimately, yes.
Q. And who ultimately decided to terminate him?
A. Gracie and myself.

14

23, 2018. Dkt. No. 50-6 at 127 (pay stub dated March 23, 2018).

Defendant argues plaintiff's complaint fails to plead a direct violation of §§ 201 or 202. Instead, defendant argues, the only claim plaintiff has alleged/argued is that the final wages plaintiff was paid were inaccurate because the area fee was improperly deducted. Defendant also goes as far to argue it is disputed whether plaintiff was terminated by the Warriors or resigned, making it unclear when the Warriors had to provide the final check by. See Dkt. No. 53 at 11 (Defendant's Opposition to Plaintiff's MSJ). These arguments fail.

First, defendant's own motion describes what happened on March 16 as a "termination." Dkt. No. 48 at 16 ("Following his termination, Plaintiff emailed Mercado…"). Second, the complaint alleges:

> Defendant's failure to pay Plaintiff and other aggrieved employees who are no longer employed by Defendant their wages earned and unpaid at the time of discharge, or within seventy- two (72) hours of their leaving Defendant's employ, violates California Labor Code §§ 201 and 202.

Dkt. No. 1 ¶97 (Complaint). Plaintiff has adequately plead and set forth undisputed evidence regarding when he was fired and when he received his final paycheck – a week after his termination. Even if plaintiff had not been terminated, the Warriors were legally obligated to provide plaintiff with his final pay check within 72 hours. But plaintiff did not receive his final pay check until a week after his final day with the Warriors.

The Court therefore GRANTS plaintiff's motion for summary judgment with respect to the eighth cause of action.

**V.     1st – 5th and 12th – 15th Causes of Action for Discrimination and Retaliation**

Only defendant moves for summary judgment on the 1st-5th and 12th-15th causes of action. Dkt. No. 48 (Defendant's MSJ). Defendant argues (1) plaintiff was terminated for legitimate, non-discriminatory reasons and (2) plaintiff cannot show the Warriors' given reasons for terminating plaintiff's employment were pretextual – i.e., he cannot show evidence of intentional discrimination or retaliation. Dkt. No. 48 at 24.

Defendant offers extensive and compelling evidence showing a history of plaintiff's

questionable behavior, as detailed above; however, a material dispute of fact exists as to why plaintiff was fired. Plaintiff's employment was terminated shortly after he returned from disability leave, within days of requesting further accommodations, and on the heels of plaintiff sharing with his superiors an explosive letter[17] to Adam Silver alleging racism, sexism, hostile work environment, and failure to pay overtime. Dkt. No. 48-1 at 148 (email chain subject line: "Nick Smith – Work Accommodations & Physical Therapy Schedule"); Dkt. No. 48-1 at 57-59 (Mr. Smith's letter to NBA Commissioner Adam Silver); Dkt. No. 48-1 at 208 (John Beaven Depo Testimony). While the Warriors had formally disciplined Mr. Smith once in November 2017, by the Warriors own admission, Mr. Smith was an "overwhelming success in this department." Dkt. No. 48-1 at 131 (2016 Performance Assessment). Thus, material questions of fact remain regarding why plaintiff was terminated and whether the Warriors' proffered reasons for terminating plaintiff are pretextual. Defendant's motion for summary judgment with respect to the 1st-5th and 12th-15th causes of action is therefore DENIED.

///

///

///

---

[17] Defendant cites various cases arguing temporal proximity does not amount to pretext, but none of the law cited is binding precedent for this Court. Further, Mr. Smith's letter to Adam Silver is not the only evidence that creates a dispute of material fact regarding the reasons for his termination.

# CONCLUSION[18]

Summary judgement is GRANTED for plaintiff with respect to the 8th cause of action for failure to pay timely wages upon resignation or discharge (PAGA). In all other respects, plaintiff's motion is DENIED.

Summary judgement is GRANTED for defendant with respect to the 6th, 7th, 9th, 10th, and 11th causes of action. In all other respects, defendant's motion is DENIED.

**IT IS SO ORDERED**.

Dated: May 26, 2020

SUSAN ILLSTON
United States District Judge

---

[18] The Court hereby GRANTS defendant's request for judicial notice. Dkt. No. 56-2. The Court hereby DENIES plaintiff's motions to seal for failing to establish a compelling reason for sealing, especially in light of the fact that most, if not all, documents plaintiff seeks to file under seal were publicly filed by defendant without objection.